IN THE MATTER OF THE APPEAL OF ALAN HAZELTINE AND ELIZABETH B. HAZELTINE AND OTHERS FROM THE RESPECTIVE ASSESSMENTS LEVIED AGAINST THEIR RESPECTIVE PROPERTIES IN THE TOWNSHIP OF MAPLEWOOD FOR BENEFITS INCIDENTAL TO AN IMPROVEMENT MADE PURSUANT TO AN ORDINANCE PASSED BY THE TOWNSHIP COMMITTEE OF THE TOWNSHIP OF MAPLEWOOD, ADOPTED JUNE 15, 1943, AS AMENDED APRIL 17, 1951.

Superior Court of New Jersey
Law Division

Decided November 7, 1952.

*Messrs. Osborne, Cornish & Scheck (Mr. A. Harrison Cornish, Jr., appearing)*, attorneys for Township of Maplewood.

*Mr. William A. Lord, Jr.*, attorney for appellants *(Mr. Alfred J. Keppelmann, Jr.*, on the brief).

WILLIAM A. SMITH, J. S. C. ■ This is an appeal by property holders in the Township of Maplewood to a Superior Court judge sitting in lieu of a Circuit Court judge, from the confirmation of an assessment for peculiar benefits, confirmed by the governing body of the township pursuant to the provisions of *R. S.* 40:56–54. That statutory provision pro-

vides that the court shall have the power to prescribe rules to regulate the practice in the taking and conduct of such appeals and the hearing thereof, and pursuant to that provision, an order has been entered, providing for the manner of hearing, which is by the court on testimony which has been taken, the pleadings, exhibits and the interrogatories. The duty of the court on an appeal of this kind is to determine if the assessments in question are just and fair assessments or awards and, if not, to make an order correcting the same, or if the assessments are sustained, so to order.

The assessment which is appealed from is for benefits accruing from a local improvement involving the enlargement of an existing outlet for a storm water system in the Township of Maplewood.

Written interrogatories and supplemental interrogatories have been served by the appellants and answered by the respondent Township of Maplewood. The appellants also took oral depositions on July 31, 1952, August 7, 1952 and September 4, 1952, the evidence before the court in determining this appeal consisting of written interrogatories and answers thereto, supplemental interrogatories and answers thereto, the exhibits attached to the answers to interrogatories, and exhibits introduced at the taking of the depositions. There is also in evidence a copy of the determination and order made on November 28, 1932 in the case of *Township of Maplewood v. Smith,* reported in 112 *N. J. L.* 233 (*E. & A.* 1934), and a copy of the ordinance adopted November 15, 1929, involved in that case, providing for an improvement in reference to the same drain that is involved in this case. The drain there involved commences where the enlarged drain involved in this case terminates.

The present improvement was undertaken pursuant to an ordinance of the Township of Maplewood, adopted June 15, 1943, and this ordinance was subsequently amended on April 17, 1951 by exscinding therefrom the authorization for the construction of certain laterals provided for in the original ordinance. The improvement consists of three parts

and the assessments are based on costs of two parts of the
new construction. The parts of the construction from which
the assessments are made will be referred to as Parts I and
II and are as follows:

I. The replacement of a pipe 66 inches in diameter by the con-
struction of a reinforced concrete box culvert, 8 feet wide and 6 feet
6 inches high, from a point on the northeasterly side of Jefferson
Avenue, upstream in a northerly direction through an easement over
private properties to the center line of Hoffman Street.

II. The replacement of a concrete pipe 33 inches in diameter by
a reinforced concrete pipe 48 inches in diameter from the termination
of Section I of the improvement, in Hoffman Street upgrade north-
westerly to its intersection with Headley Place and the replacement
of a concrete pipe 33 inches in diameter by a reinforced concrete pipe
42 inches in diameter from the termination of the 48-inch pipe at the
intersection of Headley Place and Hoffman Street, northeasterly in
Headley Place to its intersection with Arcularius Terrace.

The exhibit A–1, which is in evidence, is the "Assessment
Map For The Improvement Of Crooked Brook Drainage
System (Kendal Avenue Drainage—Sections I & II)" dated
October 5, 1950, as amended April 10, 1952. By the amend-
ment of April 10, 1952, there has been indicated on the prop-
erties shown on the map the properties owned by the appel-
lants by a diagonal line from one side of the front across to
one side of the rear. Horizontal lines on these properties
across the middle indicate properties which were assessed
for tapping benefits, and vertical lines from front to back of
the properties indicate properties assessed for diversion of
drainage.

Section I of the improvement is shown on this exhibit
A–1, and consists of an enlargement of the capacity of the
main outlet of the entire drainage system in the drainage
area here involved.

Section II of the improvement consists of an enlargement
of the capacity of an outlet for a subsidiary drainage system
of laterals extending up Hoffman Street to Ridgewood and
Collingwood Roads, up Arcularius Terrace to Ridgewood
Road, up De Hart Road to Ridgewood and New England

Roads, thence to Colonial and Sunset Terraces and Evergreen Place.

Section I of this improvement commences at the northeasterly side of Jefferson Avenue and at the start runs in a northeasterly direction, and the improvement at this point is the enlargement of the outlet by the replacement of a 66-inch pipe with a reinforced concrete box culvert 8 feet wide and 6 feet 6 inches high, the original pipe having replaced the bed of Crooked Brook, and continues to Hoffman Street. The water from the drainage area involved, which flows through this improvement in a southerly direction, flows through a stream called Crooked Brook along a course shown on exhibit A–4. Except for a culvert under Durand Road, the brook flows in the open downstream to a point near the northeasterly side of Woodland Road, where it enters a box culvert which continues under Woodland Road, Maplewood Avenue, the Lackawanna Railroad and Dunnell Road. The brook is open from that point to its outlet in the West Branch of the Rahway River at the lowest point of the valley. Crooked Brook from the northeasterly line of Jefferson Avenue, the point where the work involved in this case ended, running southerly to its junction with the Rahway River, was improved as a local improvement under an ordinance adopted October 15, 1929, heretofore referred to.

The appellants here and others in the drainage area involved in this case were assessed for the benefits accruing from the improvement under the October 15, 1929 ordinance, which was reviewed by this court, sitting as a Circuit Court judge, in the case of the *Maplewood v. Smith, supra,* which decision, except for certain properties, sustained the imposition of assessments for benefits from the improvement. The decision, as shown by the report at the citation referred to, was affirmed by the old Supreme Court and by the New Jersey Court of Errors and Appeals on the opinion of this court.

Section I of the improvement here in question is an enlargement of the capacity of the same trunk outlet for storm water

drainage as that involved in the prior improvement and Section II of this improvement is an enlargement of the capacity of the outlet of a subsidiary system draining into Section I at Hoffman Street.

In the case of *Maplewood v. Smith,* the court approved the method adopted by the assessment commissioners in imposing the assessment, it being stated in the opinion, at *pages* 234 and 235 as follows:

"The method of imposing the assessment on the individual property holders was to divide the drainage area of Crooked brook into sections and to assess the property in each section by the square foot method. The rate was graded according to the sections so that those at the bottom of the slope and nearer the outlet were assessed at the highest rate, and those farthest away from the improvement at the lowest rate. I see no objection, generally speaking, to this method that was adopted in so far as it applies to those properties that have received special or peculiar benefits."

On *page* 235 of the opinion, the court states:

"I can see no objection to assessing for a *new* outlet such properties as have benefited by the construction of laterals. They have had the benefit of using this open brook as an outlet to a drainage system up to the time of the construction of the improvement in question; the authorities having deemed it necessary to turn this brook into a drain for the proper discharge of the water collected by the laterals and which naturally comes to the brook, it now becomes the obligation of those benefited by the laterals to pay a part of the cost of this new outlet to the extent to which their property has peculiarly benefited, the outlet being a peculiar benefit to them. *Where laterals so congest water in a brook as to render it an inadequate outlet, assessment for a more adequate outlet may be made.*" (Emphasis supplied.)

The theory of this assessment is that properties received a peculiar benefit where laterals intercept drainage water which might otherwise pass over or in front of properties assessed. The capacity of the outlets of the drainage system here involved has by this improvement been enlarged by the construction under the ordinance, which improvement to the system is in addition to that effected by the prior improvement. The new and improved outlet under this im-

provement was to relieve periodic floodings of streets, lawns and cellars, as a result of a surcharge of storm water in the main and subsidiary trunks involved. This surcharge, to a large extent, results from the fact that since 1925 a large part of the drainage area was developed from farm and woodland to residential property and the transformation of meadow and woodland into paved streets, houses, driveways and lawns graded for a rapid run-off into the street so accelerated the descent of storm water into the valley as to surcharge the main trunk in times of heavy storms. (See answers to interrogatories Nos. 74, 81 and 94.) The flooding was principally to properties in Zone A.

It is the finding of this court that where laterals and trunks have been constructed, which have in part taken over the drainage afforded by the Crooked Brook, as here, and a new outlet constructed in part, property holders whose drainage is carried or facilitated by the drainage system, as here, receive a special or peculiar benefit by reason of the furnishing of a new, enlarged outlet made necessary by the improvements accelerating the descent of the storm water thereby surcharging the main trunks laid in place of the brook, there being no question that this improvement increased the discharge of water beyond the natural capacity of Crooked Brook.

The fact that this improvement has increased the natural capacity of the brook requires that the drainage system furnish the necessary outlet or outlets to take the water intercepted by the drainage improvement and that all of those who receive special benefit from said drainage improvement are subject to being assessed for benefits of any new or improved outlet made necessary by reason of the surcharge of water.

As to responsibility of landowners who discharge drainage into a watercourse beyond its natural capacity, see *Smith v. Orben*, 119 *N. J. Eq.* 291, at *page* 293 (*Ch.* 1935). This case recognizes the right of the owner of land artificially to drain into streams that discharge into natural watercourses

without liability to lower proprietors if the flow of water is accelerated or increased, *provided the discharge is not beyond the natural capacity of the watercourse.*

The obligation of not discharging water beyond the natural capacity of the watercourse requires a drainage system such as this to construct outlets adequate to care for the water collected.

The power of the township to construct improvements as here involved is under *R. S.* 40:63–1 and *R. S.* 40:56–1, the latter providing, in part, that the work may be undertaken as a local improvement, and the costs thereof, or a portion thereof, may be assessed upon lands in the vicinity thereof benefited thereby, and, in section "i" thereof the power is given for

"The construction, reconstruction, enlargement or extension of a sewer or drain, in, under or along a street, alley or public highway, or portion thereof, or in, under or along any public or private lands; the construction, reconstruction, enlargement or extension of a system of sewerage or drainage or both combined."

The statute also provides for the assessment of special benefits by commissioners (*R. S.* 40:56–26), providing that they shall

"make a just and equitable assessment of the benefits conferred upon any real estate by reason of such improvement having due regard to the rights and interests of all persons concerned, as well as to the value of the real estate benefited."

The duty of the commissioners in making the assessment for special benefits is also to be governed by *R. S.* 40:56–27 which provides:

"All assessments levied under this chapter for any local improvement shall in each case be as nearly as may be in proportion to and not in excess of the peculiar benefit, advantage or increase in value which the respective lots and parcels of real estate shall be deemed to receive by reason of such improvement."

The commissioners in the present case have followed the rule laid down in *Maplewood v. Smith, supra,* and they are

justified by the determination in that case to assess for a new outlet to replace an inadequate one, the court stating, at *page* 235 the rule by which they were guided.

The method which the commissioners followed in fixing the assessments is set forth in the answers to interrogatories Nos. 52 to 61, in their one answer to these interrogatories, which gives a clear statement of the method adopted by the commissioners. They state, and I believe they have followed, a course approved in the opinion referred to. They set up zones designated A to G inclusive, shown on the map, exhibit A–1, reducing the amount of assessment per square foot as the distance of the properties increased from the improvement for which the assessment is made, and adopted assessments based on the square foot method, resulting in a grading of the rate according to sections, so that those at the bottom of the slope and near the outlet were assessed at the higher rate and those farthest away from the improvement at the lowest rate. The commissioners also determined that where there was an opportunity of tapping the laterals or drains, there was a greater benefit than where there was a special benefit for interception of water above or in front of the lot held benefited. (See testimony of Commissioner John A. Kreitler, taken September 4, 1952, pages 18 and 19.)

The properties whose assessments are being reviewed here were all assessed under the same plan in the previous assessment involved in the case of *Maplewood v. Smith, supra,* with the exception that there are some properties on Sunset Terrace, assessed in this improvement, that were not assessed for the previous improvement because, at the time that assessment was made, the laterals did not run in front of the premises on that street, now assessed.

The principal objection made to the assessments appealed from is that the improvement did not furnish any better drainage for the respective properties and it is argued that after the drainage water has passed the assessed properties any surcharge of water into the system will flow out of the openings, be they either uncovered brooks, manholes or

catchbasins, and, of course, will not return to the lands of those assessed. If this is so as to a large number of the appellants here, it is no reason for disputing the assessment because the water which is forced out of the open drain or the catchbasins or manholes finds its way back, to a large extent, into the drainage system and through the outlets of the improvement. This particular improvement is necessary so as to take care of the water collected by it.

The improvement has also benefited those whose properties were affected by flood water due to storms by reason of the new, enlarged outlet's facilitating the passage of the storm water.

Having approved the plan of assessment adopted by the assessment commissioners, we have to consider the objections of the owners of individual plots that their property was not benefited. The approval of the commissioners' plan answers most of these objections. These appellants, however, still urge that their properties received no benefit from the improvement here under consideration. They, of course, do not take into consideration the court's determination that an improved outlet is a benefit to them.

The report of these commissioners finds that all of the properties involved in this appeal have received benefits. The rule as to the weight to be given to their findings is stated in the case of *Maplewood v. Smith, supra,* at *page 237,* as follows:

"The report of the board of commissioners is entitled to great weight and should be accepted as accurate unless controverted by clear and convincing proof to the contrary. This is the general rule of law, and the judgment of the commissioners should stand unless convincing proof is adduced against it."

Guided by this rule, it is not necessary to answer the objections of each property holder. They fall, I think, in practically all cases, into several classes.

As to those who are assessed for a tapping benefit, they say they do not tap or have a better outlet without tapping,

or that the tapping facility is not convenient. This may be so but a right to tap is considered a peculiar benefit even though it is not used. It is a proper item to be taken into consideration in valuing the property.

There is the objection of appellants whose properties are flooded following unusual storms. Some of these properties undoubtedly do have some flooding following storms. The intensity of the storm is what governs. These drainage systems cannot economically be designed to prevent flooding no matter how intense the storm is. The engineer says that this enlarged outlet materially reduces the flooding and it seems natural that it should. The property holder's statement that he does not notice any particular difference does not overcome the evidential presumption to be accorded to the commissioners' finding of special benefits.

There is also the objection that there is no increase in market value of the objectors' properties, accruing from this improvement. It is quite natural for real estate experts to say that there is no increase in value. We are dealing with a very small sum which in a single case does not amount to much but in the aggregate is considerable. The greatest amount of assessment as made by the commissioners is at the rate of $.028 per square foot, which amounts to $140 on a 50 x 100 feet lot. A tapping benefit, or a diversion benefit, is something that adds value to the property so that, even if it is small, it may be considered a special benefit.

■ I therefore must conclude that the appellants have failed to show that their assessments under consideration here are not just and fair and therefore conclude that the assessments must be sustained.